It is always somewhat earth-shattering when a district court judge decides as a matter of law that certain goods are not related. Legal concepts of relatedness are typically a fact-intensive endeavor that is left to a jury. So the question here, in this case, is how did the district court arrive at such a dramatic and dispositive conclusion? Although the counsel before you today have exchanged briefs and have a different point of view about what the district court decided, there really should be no dispute that the unrelatedness of goods' conclusion is based upon illegality. And that is that Trovan's use of the Zivquil with amoxicillin was unlawful as a matter of law because the court thought that FDA approval would be required for such use. And therefore, the court refused to consider the use of the Zivquil with amoxicillin as a legitimate use for trademark purposes. It is further beyond legitimate debate that the district court's illegality conclusion is based exclusively on an assumption. The assumption is that FDA approval was necessary in order to sell the Trovan Zivquil with amoxicillin. It's the district court's assumption in this regard that's so troubling, because mere assumptions are not the stuff that district courts should rely upon to dismiss a case on summary judgment. The record is devoid of any FDA ruling on the subject. There's no record of any statute on point. There's no governmental opinion on point. There's no expert testimony on point. In fact, this whole issue came up in a reply brief, was mentioned as a footnote, was not discussed at oral argument. It just came out of left field in the court's opinion. It is of no legal significance that Trovan, in fact, obtained FDA approval for its under-the-skin identification device. There's no evidence in the record that it really needed to do that. In fact, many companies seek FDA approval for products as a marketing tool or just to be safe in case you do need approval. There's no debate that the Pfizer antibiotic, amoxicillin in this case, did have FDA approval. So we have two FDA approvals, one for the Zivquil device to insert identification products, and we have amoxicillin that's approved by the FDA. And the Court simply assumed that if you put these two together, you'd need independent FDA approval. But there's nothing in the record to support that. Well, let me ask you to take a step back and look at a bigger picture. What confusion does your client allege result or could have resulted here? I mean, where is the confusion? Who is confused about what? Well, the evidence of confusion was largely based in the records, largely based on a consumer survey. Even theoretically, who could have been confused about what? Veterinarians, physicians, consumers. Go through those and tell me what they could have been confused about. Okay. What you have here is a situation in which when Pfizer first introduced its product, Provan, it engaged a fairly massive advertising campaign. To whom? To both pharmacists, doctors, and the general public. It spent $45 million in a very short period of time advertising its products. You don't spend that much money just targeting your products to physicians and pharmacists. In fact — Actually, they spend millions focusing on physicians. You should see the trinkets that physicians get. Well, that's true. But I think we can all recognize that broad advertising by drug companies these days is pretty ubiquitous in terms of — you'll find all kinds of prescription drugs being advertised on TV, and you're told to ask your pharmacist or doctor about this or that drug. And, in fact, that sometimes drives patients to ask their physicians to use a particular medication. So when you engage in this kind of advertising campaign, you're going out of your way to gain some recognition by consumers generally, not only physicians and pharmacists in a particular target group. In fact, this Court — So when you say physicians and pharmacists and consumers, what could they have been confused about? Okay. So you have this name Trovan that has now been broadly advertised, and it's discovered that Trovan started killing people, and they had to withdraw this particular product from the market. And there were a lot of news releases, there was a great deal of publicity surrounding this event, and Pfizer had to withdraw this product. Now, you're thinking about utilizing an identification device for your animal, or a company is thinking about using this Trovan product for some other use, in tracking medical products or tracking breast implants or anything else. Now, you hear the word Trovan, and you remember that there was a lot of negative publicity about this product. You're going to tend to stay away from it. That's what the confusion is. The confusion is that consumers, because there was so much advertising associated with this name and Pfizer, they may associate the negative publicity related to that and assume that these products come from the same company. Did your client change the name of its product? I'm sorry? Did your client change the name of its product after the — Well, it doesn't sound like your client's that much concerned then. I mean, if you were concerned about Trovan as a name, then, oh, my God, Trovan is poison. We might as well call this stuff, I don't know, Hitler or poison or something. I'll change my name. But you didn't. Well, that's certainly — it's always theoretically possible to change one's trademark in the light of negative publicity around a similar-sounding trademark. However, that's not really before the court. I mean, the — this trademark, Trovan, was paid for by Trovan just a couple of years earlier, quite a bit of money for a small company, $500,000. And it spent a great deal of time trying to expand the uses of its products under that mark in its own particular field of endeavor. To suggest that the remedy here is to change the name is certainly one possibility and a plausible possibility. But that's not the legal issue before the court. No, but I'm trying to identify what the confusion is. And the confusion you pointed to is not really with regard to the origin of Pfizer's products. It's the origin of your product. But it is not a sign that your client's particularly concerned about that if it doesn't do anything to clarify or focus or change the name, I mean, advertise that we're not Pfizer, do anything else with regard to what the origin of your product is. Well, in a reverse confusion case, there's always — the biggest risk in a reverse confusion case is that the advertising of the junior user, who is much larger, is going to overwhelm the senior, smaller user. And then there's always going to be the issue of, gee, isn't one remedy for the junior user to simply change its name so it doesn't get overwhelmed by the advertising? That's not a solution to these types of problems. I mean, certainly that's one solution. But that would kind of be unfair. And let's imagine if every time a junior user, a huge company, decided that they wanted to adopt the mark of a smaller senior user and decided, gee, you know, really, in the scheme of things, looking at the law, it's going to be difficult for the junior user to prove damages, actual damages. It's going to be difficult for them to prove actual consumer confusion. It's going to be difficult to prove any general damages. So why not just adopt their mark? It seems to me, though, that what the logical implication of what you're saying is that once you get a trademark, you're eliminating the relatedness inquiry altogether. So you get a trademark for something very specific. I'm having a hard time thinking of an example, but let's just say maker of water glasses, as I have one in front of me. And there's a possibility that sometime later a drug company might use that same name for a drug so that in terms of the products, there's absolutely no nexus at all. And then something bad happens with the drug that affects customer perception of the trademark you have for your water glasses. It seems to me, in a way, that's this case, but for the fact that later on, after the Trovan drug was marketed, your client started marketing products that were a little bit closer to the drug industry. But it seems to me then you're saying that you ought to have trademark protection for any potential use of the trademark name, even in unrelated fields. Actually, I'm not saying that at all. I understand your point. But let me address that. The focus, as noted by the Brookfield case, is on whether the consuming public is likely to somehow associate two products coming from the same source. And so the real question to ask here is, yeah, there are different classes of goods. They started out in one area. But the record is clear in this case. From the very beginning, when Joe Mason, the principal of Trovan, first found out that Pfizer was going to use Trovan as a trademark, he went and visited them and told them about what he was doing with his trademark and the product and where he was going with it and all these uses that were in the zone of expansion and pleaded with them not to use that mark. That was well before they ever used the mark. Okay, but I guess what I'm trying to pin down here is what we're really fighting about. And the question is whether the record supports summary judgment on the relatedness piece of the sleek craft factors, given what was known at the time that Pfizer began using the trademark. It seemed to me, and maybe this wasn't your intent, but it seemed to me your argument was too broad. You were really saying that any possibility that the junior mark could implode and get associated with some universally bad thing could prejudice the senior user. And I just, if that's the law, then you're eliminating the relatedness factor altogether. The question here is whether the district court was right in finding that the uses were sufficiently dissimilar, sufficiently unrelated. I agree with Your Honor that that's not the law, nor do I want it to be the law. What I'm saying is that when you look at the test, and let's look at this broadly outside of this case, the test for relatedness is what are consumers going to think when they see these two products? Are they going to be able to make some kind of conclusion? Are they going to draw a conclusion or could they draw a conclusion that these goods are related, that they come from the same source? The issue here is what is the test that we're going to look at and how broad can that test be? Pfizer argues that the test should be you've got to look at the products only, the products used on the trademark. You can only look at that. Other cases have noted that the test may be more expansive than that. And if you look at relatedness, you have to look at what other factors are out there in the marketplace that consumers may look at that they draw this connection between these two products and the fact that they may be related. And how broad can that test be? So, for example, in this case, if Pfizer had extensively advertised its product Trovan to consumers, along with its house mark, so that consumers identify Pfizer and Trovan. And Pfizer also, in this case, happens to be one of the largest provider of animal health care products in the world. They sell 240 different products to consumers and veterinarians. So there's an overlapping channel distribution here. What can a jury think about in terms of the connection? The survey that was undertaken in this case showed that if you gave people these certain bits of information, that they assumed that there was some connection. So the question, the issue before the Court is, how broad is that test going to be for relatedness? What can the jury look at in terms of what is it going to be allowed to look at? And are we going to restrict the jury to look at only the advertising related to the product itself that has a trademark? Are we going to allow the jury to look at what the companies behind those products sell? A little bit like the DreamWorks case, but there's one case actually that was a surprising case that came up, and I looked at it yesterday. It was the IDF case that was cited by Pfizer. And I just reread that case, and I realized, and that was a case where Bailey's Liquor sued the cigarette maker, Bailey's, and the Court found that there was no relation. One of the odd things that the Court noted was that S&M, the name of the company, S&H, there was no evidence that that company sold any other products to bars or any liquor products so that consumers would make no connection. That, I think, is a legitimate test. You can't just look at what the products are that feature the trademark. You've got to look at whether evidence is in the record that consumers are actually exposed to, that potential customers are actually exposed to, that might make them associate these two markets as coming from the same source. That's the test. And I'm going to jump to another issue of damages if we are fortunate enough to be remanded to the district court. It's worth spending a few minutes on this. Let's assume that, just to make the point more dramatic, that Pfizer had a discussion with its counsel when it decided to adopt the Trovan mark, and it had a very interesting discussion. And the discussion was, we've got these issues on Trovan. We've got some other marks we could use. We bought those. There's some problem here. What's the real risk of using this mark? And the attorneys told them, there's not a whole lot of risk, because in a reverse confusion case, it's really hard to prove actual confusion, it's really hard to prove actual damages. So the real risk, and there's no willful infringement in a reverse confusion case, because that's what Pfizer believes the law is. So, therefore, the risk is pretty low. You might as well go for it. You're spending $45 million on advertising. It's a pretty minimal risk. So what happens? Is there no remedy in this situation? Or in a reverse confusion case, is that the way the law is going to be? And assuming that a jury believes that there is infringement in this kind of case, that the goods are related and that there is infringement, as a jury did in this case, why isn't it appropriate if there are — if proving damages generally is very difficult, why isn't it appropriate for royalties to be one measure of damages, as the Seventh Circuit found in two cases? And if reasonable royalties, if there's nothing wrong with reasonable royalties, what is the logical reason for requiring evidence in the prior case, in previous cases, that the parties attempted to negotiate a license, and that's the only reason that royalties were even imposed? It seems to me that that endeavor is irrelevant, and it certainly wasn't imposed by the Seventh Circuit in the two cases that it found reasonable royalties appropriate. And I believe that there's no reason why the Ninth Circuit should adopt that kind of standard or test, because it doesn't make any sense. In addition, the jury should be able to consider all kinds of evidence of potential damages in this case. It should be able to consider how much money Trovan spent on advertising his products over time, and the fact that that advertising is largely wasted at this point, given the negative activity and negative publicity. It should be able to look at evidence of what Pfizer paid other companies for other alternative trademarks that weren't identical, but that they wanted to capture in order to make sure that they had exclusive use of this area. You have only about two minutes left. Do you want to say something? Yes, Your Honor. Thank you. I'll do that. Good morning, Your Honor. It's Chris O'Donnell for Pfizer. The Court well knows this case has a tortuous history going back to 1997, when the complaint was filed in trial in 1999, an extraordinary trial for those of us who do intellectual property law. The Court vacated and granted a new trial and judgment and more orders than I can even summarize in the time allotted. Primarily, not only were there legal rulings on the unavailability of certain claims, but for grotesque attorney misconduct and fraudulent admission of evidence. And what was it admitted on? The fulcrum issue of actual confusion. There were phony letters and also a phony report they tried to get in. We're here today because we learned a lot more about misconduct. And this summary judgment is based on evidence that only became available very much before the hearing, in fact, at the time of summary judgment. The Court's decision in this case is a very narrow one and a very appropriate one, and should dispose of the litigation on appeal. This Court, who knew this record, I think she would say, if she could testify sadly better than anyone, that the evidence in the case that became available after trial and after remand on the procedural appeal that came here on finality was that the, in fact, Trovan, the plaintiff, was not authorized to use the ZIP Quill 100IH from Hoeplea, the licensor, for either of two things that bear directly on the relatedness issue. One, they couldn't use it in humans. The license is clear. And it had to be animals. It says animals. It's in English. And secondly, they couldn't use it for antibiotics. And they certainly couldn't use it, the licensor thought, and I think the law is clear, unless they got approval from the FDA. On that issue of law, which the Ninth Circuit clearly allows the Court to decide as a matter of law when there's no dispute about the nature of the goods, and I'll get to that in a moment, this Court appropriately said, I can do this as a matter of law. There was no licensed use of this in any field that's remotely close to humans or what Pfizer was selling, which was off the market. What about the argument that Pfizer sells veterinary products? Well, I think, first of all, they're not the same consumers. First of all, we're not moving to their goods. We don't sell, there's no evidence we sold or do sell veterinary products for transponders, ID, giving antibiotics to animals. And the focus in this circuit, Toho and other cases, is you've got to look at the products that are an issue in this case. That might bear, Your Honor, on likely future expansion, which we could talk about in a moment. The Court didn't go off on that. That's one of the grounds under Sleekcraft. That's such a theoretical possibility, but we haven't marketed it. We don't market Trovan, the drug, in that field. There's no evidence at all that we intended to or, in fact, moved into the barcode ID business, Your Honor. And I want to be very clear about the nature of the goods, okay? There's really no dispute. So I think Judge Beard was allowed under circuit law to make the decision. One deals with animals, finding your pet, your cat. The other deals are trying to deal with 14 virulent infections. And unfortunately, the product had an unintended byproduct, as drugs do, and it was taken off the market. One uses an antibiotic. That's our product. One was not allowed to use an antibiotic. They had different customers. To answer the original question from the panel, well, who was the audience? Who did we market the $45 million to? There's no evidence it was to veterinarians or pet owners, PetSmart, Petco, or anybody like that. It was doctors and hospitals and specialists. Well, the plaintiff contends it was not just doctors and hospitals and specialists. It was the general public, which would include pet owners. It was me. I had a dog at the time, okay? All right? And the fact of the matter is it is inconceivable. You can take judicial notice, matter of law, common sense, which is, I still think, part of the law, common sense, that there's just not the same audience, okay? It's a reasonably prudent consumer test, okay? Who's the likely audience, okay? This isn't DreamWorks where Judge Kaczynski found some morphing, to use one of his words perhaps, morphing of the audiences between people who go to sci-fi conventions and watch DreamWorks movies. We are planets apart. In fact, Your Honor, I'll put it to you. These two products are starkly dissimilar as a Big Mac hamburger and a Mac truck, or Waterford Crystal and Waterford's soda crackers, okay? They're just starkly different. They were never used in the same channel of commerce, were not marketed to the same people, and the general public, Your Honor, is not the focus of the inquiry. You know, driving over here someplace, I think on Colorado Boulevard, there's a Tiffany's Grill or Tiffany something. I don't mistake that for the jewelry store. Here, and so I understand, you can say your world's apart, but are we quite so far apart here? In some fashion, both of these are medical-type products, albeit one of them is aimed at animals, the other is aimed at humans. Plaintiff contends that they had plans or the potential for expansion so that their audience would move to humans, and using the category medical broadly, maybe it's not so entirely unrelated. It is not a medical product for animals. There's a tinge of an antibiotic perhaps in some of the Zip Grill products. Well, I've got two dogs and a cat. They've all got microchips, and it was the vet's office that stuck them in. So from my perspective, that's not entirely unrelated from what a veterinarian does. But guess what? The veterinarian doesn't prescribe antibiotics in a hospital for a virulent infection. They're different audiences, different uses, different products. The hamburger and the Mack truck really are appropriate here, Your Honor, because we have to look at use and function. Ninth Circuit law is clear. We have to look to the use and function that's involved here. They're totally different uses. Does that mean there couldn't be some misunderstanding as to the source? And the one that jumped out at me as I read the papers here is Viagra, a very strong trade name. Viagra, yes. For a prescription drug. But suppose someone decides to come out with a Viagra vibrator. Pfizer doesn't produce vibrators, perhaps. Very different product. But couldn't that lead to some confusion in the minds of the consumer as to whether or what the source of that vibrator was? I think we'd be in court on that, Your Honor. I think we created this. It's become a household word in America. And I think on that circumstance, we would have – first of all, it's not a reverse confusion. It's not reverse. Reverse changes things quite a bit. But the notion – looking solely at related products does give me some concern because it does focus attention very narrowly. Well, let's look at all the other factors. Not a shred of evidence of actual confusion other than the fraudulent letters. And you go through the three factors, either a couple are neutral, Your Honor, or as we lay out in our brief, there's no likelihood of expansion. We're out of business. We don't market TROVAN antibiotic anymore. And there's not a shred of evidence that our animal group was going in the transponder. The marketing channels are starkly different. This company, until after trial, didn't really do any advertising. At best, they did the web. We spend a lot of money. The marks aren't even similar in one sense. Our house named Pfizer with the distinctive logo always accompanied TROVAN, Your Honor. Okay? And the fact is there's been no confusion in five years, and the only evidence we offer was fraudulent. There is none, okay? And the fact is that – and let's go to this. Who's the consumer? The tiny circuit test is the reasonable, prudent consumer. You're the consumer for the microchips for your dog and cat, Your Honor, dogs and cat. The consumer of TROVAN antibiotics was not pet owners, veterinarians, or pet store proprietors. It was doctors and hospitals, okay, people that were treating deadly diseases. That's correct as long as – let me really go back to a factual kind of question here. As long as the marketing efforts really are aimed at that audience. In fact, there are lots of prescription drugs that are advertised to the general public because it's known that people do go in and ask for things by brand name. What's the state of affairs with regard to marketing? We've heard from plaintiffs that this marketing was broad. We saw in your briefs that your contention is to the contrary. Well, it was broad, okay? Yes, there is some DTC advertising, direct-to-consumer advertising, which is becoming more prevalent for drugs like Viagra, Viala, whatever the other competitors are, whatever. But the fact of the matter is there's not a shred of evidence in this record of two things. One, that anybody was actually confused. There's no evidence of this. And two, think about it. It's improbable that they would be confused. They're just in totally different streams of commerce. If I want to buy a hamburger, I don't go to a big Mac truck dealer. And those who want to use rent or haul goods across the country with a big rig don't go to McDonald's and say, can I lease a Mac from you? And that's really our case here, because I'm not trying to be silly, although Trademark does lend itself to fancifulness and opinion writing. It's almost as bad as patent cases. Almost as bad as patent cases, Your Honor. But what I'm trying to illustrate here is that Judge Baird was on solid ground, terra firma, because there is no dispute about the nature of the goods, so she could look at it. And it's undisputed in the record that the license clearly provided for animals only. So if they were thinking or claiming they were going into the human field, they couldn't. Second, the FDA had said, when Zipco got a limited use authorization, do not advertise or claim it has any, quote, human medical utility. That's in the record. Okay? And thirdly, okay, they clearly can't go off and start going into the pharmaceutical area, which is our business, okay, without FDA approval. And the fact of the matter is the record, I think, is as clear as the nose on my face, that Judge Baird not only was appropriate to deal with the issue, and she should, and she's backstopped by all the other factors, which I've briefly summarized and are highlighted in her decision and in our brief, that as a matter of law, this case should have been mercifully terminated when it was in June of last year. The issues that they raise on appeal about damage, the fact of the matter is there's no record evidence of any damage. This was a marginally profitable company. This is not the case to reach out and see whether you want to embrace Sands I and Sands II in the Seventh Circuit on a reasonable royalty, because the courts that have had that may have reached that, the one circuit that has reached the decision has prudently required some evidence that the owner was in the business of licensing its mark, and there's no evidence of that in this case. And finally, to the extent there was a cap on damages put in this case, the $500,000 limit was the, charitably, I think, found by the Court to be the maximum value of the mark, and you can't get damages in excess of the mark. I just want to conclude, Your Honor, that there's a procedural suggestion in their brief that somehow you should also vacate the new trial and all those judgment decisions below. They didn't appeal the finding of new trial on attorney misconduct and fraudulent submission of evidence. So that was never. I believe you should affirm Judge Baird on the ruling that as a matter of law, because the good, the nature of the goods were not disputed, but rather conceded, she could determine as a matter of law that these goods were not related. Because a reasonable jury would have to reach the same conclusion, and she as the 13th juror would be obligated under the law to take that away, because there's no license for human use. It's for animals, and you can't move into a field of antibiotics, whether with animals or putting it in humans, which would be the possibility of a conflict, nature of the goods, without FDA approval, something that was a condition of the license and is the law. We're really talking here about the proper parameters of the relatedness piece of Sleecraft, correct? It is, Your Honor. And I think, if I could address that, the case I should have cited, Sleecraft itself said when discussing that criterion that we have to see whether or not they are close in use and function. They're not close in use and function, okay? Dream work. It's not a question of law or a question of fact. I think it can be determined as a question of law if on the record there's no reasonable dispute in the evidence that you would have to submit to the jury. And there is no dispute in this case. It's my big Mack truck. I mean, there's a good question. One question is I think your opponent suggests you ought to be able to look beyond simply comparing the two products and look at the other things that companies do. Do you disagree with that? Oh, yes. The law of the circuit is clear, Toho, in other cases, that you look at only the goods bearing the marks that are in dispute of this case. The fact that Sears Roebuck had lots of products that got dispositive in the Godzilla case, the court there told us, no, we're going to look at the particular use that's involved in this case. And the fact that Pfizer had an animal group that did work in the animal field is irrelevant. We've got to look at Trovan, ZipQuil or whatever that was licensed from the Dutch licensor and the antibiotic that we used in human beings in hospitals for Pfizer, Your Honor. That's the relevant inquiry under circuit law. And yes, you say we're precluded by circuit law from going beyond simple comparison of the products. No, I think you could. No, I'm not the one to tell this panel what they can do. Well, no, we are. I mean, everybody else does. Gee, there are certain things that can only be changed by an unbanked court. And so we're interested always in knowing whether it's the parties position that we are limited by the existing cases. Well, since I think it benefits me here, I would humbly suggest that. But I also think that the law of the circuit on how you inquire as to relatedness of goods is appropriate and it has some wrinkles. For example, Brookfield says let's see if they're used for similar purposes. That was the movie buff trademark, okay? They're not used for similar purposes here. Sleek Craft said are they – there they found that because there were boats, one was The court said, well, there the products were, quote, extremely close in use and function. That's not true here. They're as disparate as you can possibly be. In Murray v. CNBC, America Talking was the mark involved there. The services were just unrelated. And Entrepreneur, one was a magazine and the other was the name of a public relations firm. So what I'm saying is we have some texture to the basic framework of the law on relatedness. And there's not a single case that the Trovian plaintiff can point to that should say that you should not affirm Judge Baird within the current law of the circuit. But I would suggest that it's – gosh, Your Honor, it's a triumph of form over substance to say that when there's no dispute as to the nature of the goods, Judge Baird couldn't say, look, the license says it's for animal products only. The licensor submitted a declaration that said it was for that purpose and that they had terminated the license in this case. You can't bring an infringement case and argue relatedness of goods if your license has been terminated. The evidence was also disputed that the licensor demanded and expected that they would get FDA approval if the ZIP code was going to move into the human area, and we think that's clearly the situation, that you have to have FDA approval. And the evidence is clear that while they – Mr. Mason talked about seeking FDA approval to move ZIP code into a lot closer territory that we were in, they never did so. So I think we're dealing with some theoretical issues on appeal that are not the record of this case. I think Judge Baird was very appropriate, even given the severe restrictions of making decisions on summary judgment, in this area with the goods not in dispute and very dissimilar and not close at all in use and function, not having overlapping audiences, I think the decision was heavily correct and should be affirmed. Let me ask you one other thing. And it's a peculiar twist in this case. I mean, you have reverse confusion here. Yes. And it becomes reverse – and usually reverse confusion doesn't lead to much injury, and so you don't often have damages and so forth. But in this case, we have a name that acquired a negative connotation because of the misfortune of Trovan. And so when I asked, you know, what's the confusion, the answer I got back was focused on plaintiff's actual product and that people might think plaintiff's actual product might have come from this source that is now tainted. So it is reverse confusion in a way that has a negative impact that reverse confusion doesn't ordinarily have. How does that fit into the scheme of things? I mean, can you proceed on a claim that says this name is now poison and it gives me a problem and I shouldn't have had this problem, so I deserve compensation for my injury? Well, you know, that whole poison the drug kills was one of the misconducts of the attorney led to a grant of a new trial, and it was ephemeral at best. The drug was on the market, had a liver problem, and then they took it off the market. They didn't offer any evidence in this case. I think it's very important. They didn't bring one person forward, and they seemed quite adept at putting on evidence that it had a problem. Then one person came in and said, you know, I thought that this thing that I was giving my pet or thinking of giving my pet could kill my pet or injure my pet because it was its source was that Pfizer company that made that deadly Trovan antibiotic. There's not a shred of evidence in this case that that occurred, and that's because I think it's improbable in the extreme that it actually occurred, okay? If a, if a, again, if a Big Mac truck has a design function, and I read about it in the L.A. Times, I'm not inclined to believe for a moment that I shouldn't go, I shouldn't go for other reasons, but I shouldn't go to McDonald's and order a Big Mac. I just don't think that. It's not reasonable. The law would be, I won't say the word, to even let that come into the equation. And I think that's why, Your Honor, and the question, a good question, it stimulates our thinking on where the boundaries are here. But we're well within the boundaries of circuit law, and this record is clear. It's undisputed that this license was severely limited for animals, not humans, and that it was terminated, okay, because they were purporting to be able to do human applications. The FDA said when they had the limited approved reciprocal, you cannot make claims it has human medical utility. That's in the record cited by the judge below. And I think because the license didn't authorize it, they never got FDA approval, they never sold, they never actually sold the product. That gets to the possible expansion of Plaintiff's products. Right, which is a tandem issue. Plaintiff's also saying my product that I'm not disputed to have had from the very beginning, I'm impaired there because I now have this name that's undesirable. Well, I don't think they have to change their name. That issue came up earlier, okay. But the companies, they didn't offer any evidence from anybody. I mean, we give some deference to circumstantial evidence, what reasonable inference is, taking A, B, C to D. They didn't offer any evidence that they suffered, in fact, any harm because of the misfortune of the Trovan Pfizer antibiotic. Not any evidence, and nor could you conclude under Sleekcraft because of the factors we outlined that there's any likelihood of confusion. And, you know, it's a probability determination in this case, not a possibility. And on the factors on the record in this case, I think the judge, while she went off on the relatedness, had many other good and sufficient reasons on the record to affirm, to grant this summary judgment. Thank you. Thank you very much. Three quick points. I wasn't at the trial, but on this record, I can tell you this. The Court's decision was not based upon the Hopliet contract, and she noted that in a footnote, and that's really not debatable. It's not based on what? The Court's – the district court's decision granting summary judgment had nothing to do with the Hopliet contract or what the rights were under that contract, and that's not debatable. It's clear as day in the Court's decision. Her decision was based upon purely illegality. Now, this Court can consider all the facts de novo, and it can look at all the sleepcraft factors, and that's also beyond debate, and that's what we're doing here. In terms of the test for what juries get to look at in terms of whether they can associate one topic with another, I don't think it would be a good idea to limit the facts of what a jury can look at. There's no – there's an infinite amount of facts that can be looked at by a jury that we can't even limit. But that's the problem I was having earlier, Counsel, that you could carry it out to an absurd conclusion, and I'm not suggesting that that's what you're doing. But in a reverse confusion case, if you had something that was bad enough at the junior end, that you gave the Hitler example or somebody did, and you couldn't foresee that at the time you started using the mark, I mean, is that something that should go to a jury? No. But I think that Judge Kaczynski in the Greenworth case, when he said, let's – you know, don't look at just the prime directive. Look at what's really going on. Look at the whole commercial context. Look at the whole commercial context. And that's what we've got to do. If we – if the Court starts trying to figure out where things can go and what juries can look at and what they can't look at, we're in trouble, because we're never going to be able to figure that out. So it's up to the jury to decide whether all these different factors that come in could lead consumers to associate one good with the other. And I think we should leave it that way. Finally, I have scoured the record of cases, and I have found not a single case where a court came to conclusion that in proving what goodwill damages are, that you have to go back to what the company originally paid for the trademark. I don't think that's appropriate law. I don't think that that decision should be sustained. I think it's reversible error. Thank you very much. Thank you, counsel. Thank you both very much. The case just argued will be submitted.
judges: Reinhardt, Clifton, Fogel